## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| **HOWARD G. HUTCHINSON,**<br><br>                    **PLAINTIFF,**<br><br>     **v.**<br><br>**ASTRAZENECA PHARMACEUTICALS, LP,**<br><br>**and**<br><br>**JORIS SILON**<br><br>                    **DEFENDANTS.** | **Civil Action No.**<br><br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT AND JURY DEMAND

Plaintiff Howard G. Hutchinson, by and through his attorneys, Bell & Bell LLP, hereby files the following Complaint and Jury Demand ("Complaint").

## PRELIMINARY STATEMENT

1.       This is an action for an award of damages and other relief on behalf of Plaintiff Howard Hutchinson (hereinafter "Plaintiff" or "Dr. Hutchinson"), a former employee of AstraZeneca Pharmaceuticals, LP ("AstraZeneca"). Despite his loyalty and consistent performance, AstraZeneca subjected Dr. Hutchinson to age discrimination and harassment, and retaliation for complaining about discrimination and harassment.  Defendant Joris Silon aided and abetted AstraZeneca's discrimination, harassment and retaliation as set forth herein.  Further, Dr. Hutchinson was retaliated against and wrongfully terminated after he reported his legitimate safety concerns and openly disagreed with the decisions made by his superiors dismissing his safety concerns. Additionally, Dr. Hutchinson is contractually owed significant compensation that has not been paid. Dr. Hutchinson has also been harmed by defamatory statements made to

third parties regarding his departure from AstraZeneca and the impact it is having on his ability to secure a new position and continue in his career. Due to these wrongful acts of Defendants, Dr. Hutchinson has suffered significant damages.

2.     This action arises under the Age Discrimination in Employment Act, 29 U.S.C. § 621, et seq. ("ADEA"), the Delaware Discrimination in Employment Act ("DDEA"), the Delaware Whistleblowers' Protection Act, 19 Del. C. §§ 1701 et seq. ("Whistleblowers' Act"), the Delaware Wage Payment and Collection Act, 19 Del. C.§§ 1101 et seq. ("DWPCA"), and the common law of Delaware.

## JURISDICTIONAL STATEMENT

3.     This Court has original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States pursuant to 28 U.S.C. §§ 1331 and 1391.

4.     The jurisdiction of this Court is also invoked pursuant to 28 U.S.C. § 1343(4), which grants the District Court original jurisdiction in any civil action authorized by law to be commenced by any person to recover damages to secure equitable or other relief under any act of Congress providing for the protection of civil rights.

5.     This Court has supplemental jurisdiction over any Delaware state law claims pursuant to 28 U.S.C. § 1367.

6.     All conditions precedent to the institution of this suit have been fulfilled. On December 20, 2024, Plaintiff timely filed a Charge of Discrimination with the United States Equal Employment Opportunity Commission ("EEOC"), which was dual-filed as a Complaint with the Delaware Department of Labor ("DDOL"). On June 20, 2025, the EEOC issued a Notice of Right to Sue to Plaintiff.  On June 26, 2025, the Delaware Department of Labor issued

a Notice of Right to Sue to Plaintiff.  This action has been filed within ninety (90) days of Plaintiff's receipt of said Notices.

## VENUE

7.     This action properly lies in the District of Delaware, pursuant to 28 U.S.C. § 1391(b).

8.     This action properly lies in the District of Delaware because significant activities associated with the claims alleged took place in this jurisdiction and because Plaintiff was employed and terminated by AstraZeneca in this jurisdiction.

## PARTIES

9.     Plaintiff Howard Hutchinson is an adult male citizen and resident of West Deptford, New Jersey and the United States of America.

10.     Defendant AstraZeneca Pharmaceuticals, LP, a global, science-led biopharmaceutical business. is a Delaware corporation with its principal place of business in Wilmington, Delaware.

11.     Defendant Joris Silon is a resident of West Chester, Pennsylvania who performed work for AstraZeneca in Wilmington, Delaware.

12.     Most recently, from approximately 2016 through May of 2024, Dr. Hutchinson worked at least two (2) days each week from his residence in New Jersey and certain other days at the AstraZeneca office in Wilmington, Delaware.  During the pandemic, Dr. Hutchinson worked for a period of approximately one year exclusively from his home in New Jersey, which AstraZeneca permitted for employees during the pandemic.

13.     At all relevant times, AstraZeneca is and has been an employer employing more than 500 employees.

3

14.    At all relevant times, employees of AstraZeneca acted as agents and servants for AstraZeneca.

15.    At all relevant times, employees of AstraZeneca were acting within the scope of their authority and in the course of their employment under the direct control of AstraZeneca.

16.    At all times material hereto, AstraZeneca acted by and through its authorized agents, servants, workmen and/or employees acting within the course and scope of their employment with AstraZeneca and in furtherance of AstraZeneca's business.

17.    At all relevant times hereto, Plaintiff was an "employee" of AstraZeneca within the meanings of the laws at issue in this suit and is accordingly entitled to the protection of said laws.

18.    At all relevant times hereto, AstraZeneca was an "employer" and/or "person" under the laws at issue in this matter and is accordingly subject to the provisions of said laws.

19.    This Honorable Court has personal jurisdiction over the AstraZeneca.

## FACTS

20.    Dr. Hutchinson is 64 years old and an individual protected against discrimination by the ADEA and DDEA.

21.    Dr. Hutchinson is a highly accomplished physician and, prior to his constructive discharge, was a long-tenured and well-respected employee of AstraZeneca.

22.    Dr. Hutchinson is a senior pharmaceutical executive and board-certified cardiologist with over 29 years' experience bringing new medicines, new indications and innovative approaches to enhance access to medicines to patients and consumers.

23.     Dr. Hutchinson's experience spans multiple therapeutic areas with a particular focus on developing new therapies and approaches to treat cardiovascular, renal and metabolic diseases.

24.     During his accomplished career, Dr. Hutchinson has worked collaboratively with regulatory authorities across the globe, including the FDA, as Dr. Hutchinson was the lead representative at FDA Advisory Committee Meetings and other pivotal regulatory interactions, including recent meetings with the FDA on a new digital pathway developed by his team to enhance access to medicines.

25.     As a senior R&D leader working on high priority projects, Dr. Hutchinson successfully interacted on numerous occasions with analysts, investors and media outlets to communicate a corporate vision.

26.     In this regard, Dr. Hutchinson was a dedicated, hardworking and loyal employee of AstraZeneca for almost 29 years.

27.     While employed by AstraZeneca, Dr. Hutchinson performed his duties in an excellent and hardworking manner.

28.     Dr. Hutchinson's employment with AstraZeneca began in 1995 as Medical Director and he was promoted several times throughout his employment, including holding the role of Chief Medical Officer for AstraZeneca.

29.     Most recently, from January 2019 until his constructive discharge in May 2024, Dr. Hutchinson held the position of Vice President, Digital Medicines Development.

30.     During his time with AstraZeneca, among many other significant contributions, Dr. Hutchinson was responsible for leading the development and approval of Crestor and

overseeing the development of several other noteworthy drugs, including, but not limited to, Brilinta, Onglyza, and Farxiga.

31.     As Chief Medical Officer for AstraZeneca, Dr. Hutchinson was also responsible for leading issue management teams responsible for addressing important safety issues that would have resulted in negative outcomes for several critical AstraZeneca brands if not managed correctly.

32.     Dr. Hutchinson has received exemplary performance reviews over his many years of service at AstraZeneca, attesting to his dedication, strong work ethic, and insistence on safe and appropriate actions throughout his employment.

33.     As Dr. Hutchinson advanced in age, and after he repeatedly raised significant safety issues with AstraZeneca, he was subjected to a concerted effort to make his position redundant, and he observed similar treatment of his older colleagues as well.

34.     While taking steps to make his position redundant, AstraZeneca was simultaneously increasing Dr. Hutchinson's workload and removing resources, including removing key individuals from his development team, despite his repeated objection.

35.     Dr. Hutchinson maintained the highest ethics and consistently worked to ensure that AstraZeneca products were properly and safely labeled prior to distribution.

36.     During his time as Chief Medical Officer of AstraZeneca, Dr. Hutchinson was responsible for ensuring that AstraZeneca's marketed products continued to have a "proper benefit to risk" profile.

37.     Thus, Dr. Hutchinson was required to assess all new information that would have a significant impact on the safety or efficacy of an AstraZeneca product.

6

38.    Accordingly, Dr. Hutchinson became very familiar with how to evaluate product safety and what information should be included in the various sections of the prescribing information for products.

39.    Because AstraZeneca moved its safety oversight for generic products to a team in India, problems often arose when that team lacked the historical knowledge or experience to deal with some of the more significant safety requests from regulatory agencies worldwide.

40.    Dr. Hutchinson had been clinical lead of a digital technology program called Project Fleet and was also involved in Project Cutter - the program for moving rosuvastatin (the generic name of AstraZeneca's Crestor) from prescription to nonprescription status.

41.    For Project Cutter, Dr. Hutchinson was also responsible for reviewing all labeling changes to the Crestor prescribing information because the changes could have implications for the design of the Web Application and the Drug Facts Label (the prescribing information for a nonprescription product) for nonprescription rosuvastatin.

42.    On several occasions, Dr. Hutchinson raised safety concerns including issues regarding the labeling of AstraZeneca products and openly disagreed with the decisions made by AstraZeneca.

43.    For example, a publication showed a drug-drug interaction between two AstraZeneca products, rosuvastatin and ticagrelor.

44.    There was disagreement between medical, safety and clinical pharmacology regarding how to handle this interaction. Dr. Hutchinson was thus asked to review the information due to the potential negative impact on AstraZeneca's ability to have nonprescription rosuvastatin used by individuals with established heart disease in the future.

45.     Dr. Hutchinson suggested, and the clinical pharmacology team agreed, that the data would support capping the rosuvastatin dose at 20 mg in such individuals.  The rationale was that the risk for adverse reactions from statins such as myopathy were dose related, and the interaction indicated that the maximum dose of rosuvastatin should be 20 mg and not 40 mg.

46.     At a global safety meeting where the data was thereafter discussed, the then-current CMO and Senior Clinical Lead disagreed that the rosuvastatin dose should be capped, arguing that the clinical data did not support a dose cap since there was no evidence for adverse reactions when using rosuvastatin 40 mg with ticagrelor.

47.     They indicated that, despite the data being robust, AstraZeneca did not know the extent of the interaction and that AstraZeneca should conduct its own study (which was atypical in such a situation).

48.     While Dr. Hutchinson preferred to have the dose capped at 20 mg based on the data, the decision was made that the prescribing information should be updated to inform healthcare providers about the interaction, but without providing safety or dosing recommendations.

49.     Several weeks later, upon receipt of proposed language for Crestor's Core Safety Data Sheet, Dr. Hutchinson observed that the language stated that there was an interaction between rosuvastatin and ticagrelor that could cause myopathy and rhabdomyolysis but did not include dosing recommendations.

50.     Dr. Hutchinson again raised his concern that if the clinical data could not preclude the possibility of patients getting myopathy or rhabdomyolysis, AstraZeneca must give dosing instructions similar to other clinically significant drug-drug interactions.

51.     Despite Dr. Hutchinson voicing these safety concerns, he was told that the recommended language would be sent to the FDA.

52.     Dr. Hutchinson stated that if AstraZeneca believed that the current published clinical pharmacology study was robust, and that there was an interaction that could cause myopathy and rhabdomyolysis, AstraZeneca must tell health care providers how to manage it – but AstraZeneca declined to do so.

53.     Sally Walsh, the regulatory lead on Dr. Hutchinson's team, was asked to assist with the U.S. submission process, and she reiterated Dr. Hutchinson's concerns about the approach being taken by the global team, and was told that she and Dr. Hutchinson were to stop raising the issue because it was already decided.

54.     A few weeks later, Dr. Hutchinson was asked to sign off on the new proposed language for Crestor. Dr. Hutchinson refused, stating that he had significant concerns consistent with his previous objections.

55.     When AstraZeneca sent the proposed language to Dr. Hutchinson's manager, Will Mongan, a designated signatory for such labeling changes, Dr. Hutchinson explained his rationale to Dr. Mongan for not signing.

56.     Dr. Mongan also indicated that he would not sign.

57.     Dr. Hutchinson then received a call a day or two later from a senior safety leader who was responsible for the process of reviewing new safety information for AstraZeneca.

58.     This safety leader informed Dr. Hutchinson that he agreed with Dr. Hutchinson's position and that he was willing to restart the entire process to address Dr. Hutchinson's concerns.

59.     Dr. Hutchinson told him that the next step in the process would be to review this issue with Joris Silon and have Mr. Silon make an independent determination.

60.     Dr. Hutchinson then informed Mr. Silon about the situation and why he would not sign, reiterating his concerns.

61.     Shortly thereafter, Mr. Silon signed off on the proposed document.

62.     Immediately after Dr. Hutchinson's openly expressed concerns with regard to how safety data was being handled within AstraZeneca, AstraZeneca engaged in a concerted effort to oust Dr. Hutchinson, making it impossible for him to succeed in his role.

63.     This included, among other things, issuing objectives that were impossible to meet, refusing to provide any much-needed assistance, refusing to discuss Dr. Hutchinson's career at the end of the project, and refusing to appropriately compensate Dr. Hutchinson for his efforts and performance.

64.     On March 7, 2024, Dr. Hutchinson met with Mr. Silon to discuss the status of Project Cutter following the submission of the NDA and AstraZeneca's decision to retire Will Mongan.

65.     Specifically, at that meeting, Dr. Hutchinson set forth his concerns that essential resources were being removed from the project at a critical time seriously jeopardizing the success of the program, his disappointment in how he had been rewarded for his 2023 performance, and his desire to have clarity on his role at AstraZeneca at the completion of Project Cutter.

66.     Regarding the removal of resources, Dr. Hutchinson noted that AstraZeneca only had four (4) employees remaining with knowledge of the details of the project.

67.     The fact that AstraZeneca also let go of all of the experienced commercial staff only added to Dr. Hutchinson's already insurmountable workload and needed to be properly addressed.

68.     Because these individuals were required to deliver a regulatory approval that also involved an FDA Advisory Committee Meeting, and the FDA had sent several "Information Requests," the team had been working nights and weekends to provide a timely response.

69.     AstraZeneca's demand that Dr. Hutchinson lead FDA Advisory Committee activities for the company and all activities related to the NDA submission significantly increased his workload.

70.     As pointed out by Dr. Hutchinson, this was an enormous workload for a small team that was not appropriately recognized for the great achievements delivered in 2023, and it would be extremely difficult to keep that team motivated to continue to work long hours to deliver a project that was not recognized as important by many individuals at AstraZeneca.

71.     Dr. Hutchinson's team was aware that they needed more physician support, and, as the team leader, it was Dr. Hutchinson's responsibility to see the project was properly resourced.

72.     Dr. Hutchinson had questioned how AstraZeneca would ensure that essential staff remained with AstraZeneca until regulatory approval – but never received a response.

73.     Dr. Hutchinson's request to be paid for the enormous amount of additional effort that would be required to deliver this project was not unreasonable, nor was his request to have additional physician support when they refused to compensate him appropriately.

74.     Dr. Hutchinson further noted that, because he had not been properly compensated for his 2023 accomplishments – and not given a performance rating of "Outstanding," as was

recommended by his manager Will Mongan, he wanted to ensure that he would be properly evaluated and compensated for the role that he was expected to fulfill on the project in 2024. In this regard, Dr. Hutchinson sought clarification as to why he was not rated as "Outstanding" and what would qualify for such a rating.

75.    Dr. Hutchinson also expressed his concerns regarding his future at AstraZeneca and the pattern of treatment he had observed as he advanced in age.

76.    Dr. Hutchinson noted there had been three (3) prior occasions where AstraZeneca had made him redundant with his role.

77.    AstraZeneca's actions over the previous several months made it clear to Dr. Hutchinson that AstraZeneca was highly unlikely to launch nonprescription rosuvastatin, as all experienced commercial support had been pulled from the team, and the team continuously struggled to obtain resources.

78.    Because his role at AstraZeneca was specific to delivering this project, Dr. Hutchinson expressed concerns that he would no longer have a role at AstraZeneca once the NDA was approved.

79.    Thus, Dr. Hutchinson requested a clear understanding of AstraZeneca's intentions regarding his employment with AstraZeneca once the NDA was approved, or once they received a complete response from FDA.

80.    Dr. Hutchinson noted that others, who were significantly younger than Dr. Hutchinson, were afforded the consideration of a discussion when working on projects that had a clear completion timeline and no other mutually acceptable role clearly identified, and he sought that same courtesy.

81.     Following that meeting, Dr. Hutchinson also realized that his current job description did not match his then-current role, which needed to be rectified.

82.     On March 8, 2024, Dr. Hutchinson emailed Mr. Silon regarding his job description, noting that he had just recently learned that his job description for his current role was VP, Regulatory, even though this was not the role he had been performing since joining the U.S. business and his MRP was assessed against that role for merit increases.

83.     Dr. Hutchinson noted that he had not had a merit increase in approximately 10 years, and asked what the MRP would be for the role he was performing.

84.     Dr. Hutchinson stated that his understanding from Dr. Mongan, his manager, was that his then-MRP was about 128% for the VP, Regulatory position.

85.     On April 15, 2024, Dr. Hutchinson emailed Mr. Silon to confirm the substance of their meeting that had taken place on March 7, 2024 and to summarize some important questions that he wanted to discuss with him.

86.     Mr. Silon and Dr. Hutchinson met again the next day, on April 16, 2024, to discuss Dr. Hutchinson's concerns.

87.     Dr. Hutchinson again emailed Mr. Silon on April 19, 2024 to confirm the substance of their meeting and to provide Mr. Silon with additional information to help Mr. Silon with his discussions with his manager, Ruud Dobber.

88.     In this email, Dr. Hutchinson forwarded to Mr. Silon draft objectives that aligned with the role of VP, Clinical Development for the current project, including standard time commitments against these objectives.

89.     Dr. Hutchinson noted that, as he had delivered these types of objectives in the past, the time commitments provided were reasonable estimates, and these draft objectives were

being provided to crystallize his concerns about the significant workload associated with this role and the time commitment that would be required for one individual to successfully lead these activities.

90.     The time commitment data clearly showed that the workload required more than a single individual to complete all the tasks during a typical 40-hour workweek.

91.     Dr. Hutchinson further noted that Mr. Silon's suggestion that Dr. Hutchinson drop a band level to receive about a 2% merit increase was not acceptable because his overall rewards would be less than his current level.

92.     Thus, AstraZeneca needed to reconcile how to accommodate a merit increase (with Dr. Hutchinson requesting a 6% merit increase) for the new position for this year without impacting Dr. Hutchinson's band.

93.     Dr. Hutchinson also noted the long hours required to deliver an NDA for AstraZeneca, and thus requested a retention bonus of $350,000 for the project for himself, as well as a retention bonus for the 3 additional employees who were critical to the success of the project.

94.     This request was not unreasonable because AstraZeneca had routinely given retention bonuses to key individuals working on important Company projects to ensure individuals remained motivated during periods of high stress and did not leave to pursue other opportunities.

95.     Dr. Hutchinson also sought clarity on how he would be rewarded against his objectives next year, as he had not received his expected "outstanding" rating and wanted to ensure that he would receive such ratings and be compensated accordingly upon meeting his objectives.

96.     Dr. Hutchinson reiterated the need for clarity regarding his employment status once the FDA made a decision on the NDA.

97.     One of the goals of Dr. Hutchinson's April 19, 2024 email to Mr. Silon was to give Mr. Silon a very clear understanding of his concerns and how and why Dr. Hutchinson believed his role should be evaluated and compensated the following year.

98.     Among other things, Dr. Hutchinson also reiterated his previous request for Mr. Silon's objectives regarding the delivery of the NDA for Project Cutter since Mr. Silon stated in March that delivering the NDA was one of his objectives.

99.     At AstraZeneca, managers routinely share their objectives with their teams to ensure that the goals of the manager and team are completely aligned.

100.    Despite multiple requests from Dr. Hutchinson for Mr. Silon's objectives relative to Project Cutter, Mr. Silon was never forthcoming with his Project Cutter objectives.

101.    Dr. Hutchinson noted that if the team did not get the people resources requested, they would not be able to meet the objectives.

102.    Several days later, on April 23, 2024, Mr. Silon responded to Dr. Hutchinson's email, noting that: (1) he had made adjustments to his job description to remove references to Project Fleet, as the focus was on Project Cutter; (2) Dr. Hutchinson's request for a 6% merit increase was rejected; (3) AstraZeneca had shown its dedication to the project by releasing an additional $10 million in funding to secure a positive FDA approval and AstraZeneca had increased support through normal business functions; and (4) Dr. Hutchinson was not identified as an "exceptional contributor" in 2023 because, while "most" goals were met, specific goals around timing and budget were not delivered, and Dr. Hutchinson received 146% of his target

bonus; and that even if Dr. Hutchinson were to deliver the NDA, it still would not guarantee that he would be deemed an "exceptional contributor".

103.    Mr. Silon further noted that he had attached the draft objectives document sent by Dr. Hutchinson with feedback on his proposal, and that they would provide clarity on next steps for after the NDA was approved after he had spoken with Ruud Dobber.

104.    Later that same day, Dr. Hutchinson responded to Mr. Silon's email, noting that Mr. Silon had not addressed his concerns, inputting comments to each of Mr. Silon's statements.

105.    Regarding his 2023 performance, Dr. Hutchinson disputed Mr. Silon's assessment of his 2023 performance, noting that he had met all goals in 2023, that no one ever informed him that he had missed a goal, it was the decision of Mr. Silon and others that impacted budget issues, and he and his team delivered ahead of the target date.

106.    Dr. Hutchinson also stated that securing resources to deliver the NDA continues to be an issue because Mr. Silon did not "adjust" resources on the project as he stated in his email; he removed resource from the project without providing a clear plan for how that critical resource would continue to be provided to the team.

107.    Dr. Hutchinson also reminded Mr. Silon that the draft objectives he submitted to Mr. Silon clearly show a role that requires more than one physician.

108.    Dr. Hutchinson reminded Mr. Silon that his reward of 146% of his target bonus was due to the Company performance factor, which applied to all employees regardless of their rating.

109.    Had Dr. Hutchinson been evaluated as "Outstanding", as recommended by his manager, his reward would have been much higher.

110.    Regarding the 2024 draft objectives, Dr. Hutchinson stated that he would create new goals, which would be focused on his existing job description, and would not include many objectives of the draft job description, as the clinical VP role was extremely difficult and would require more than one individual.

111.    Dr. Hutchinson noted that, while he appreciated that they would be meeting later to discuss next steps, Mr. Silon needed to fill the medical leader gap created based on Mr. Silon's decisions, and that he would not be able to focus on advancing Project Cutter in the same manner given that his role on the project would change based on Mr. Silon's decisions.

112.    In his email, Dr. Hutchinson requested that AstraZeneca identify a medical leader to take over the clinical needs for the program, while he provided support consistent with his job description, and expressed regret that AstraZeneca was asking him to take on a role that was not consistent with this job description, would require long hours, and potentially result in divestment of the product and his severance from AstraZeneca.

113.    Dr. Hutchinson also noted his disappointment that AstraZeneca was unwilling to make any commitments regarding Dr. Hutchinson's compensation for the role.

114.    On the morning of April 24, 2024, Dr. Hutchinson had a short and impromptu meeting with Mr. Silon where he reminded Mr. Silon that he had responded to Mr. Silon's April 23, 2024 email, and that Mr. Silon's email had not addressed Dr. Hutchinson's concerns about his workload or requests for additional compensation if the company was insistent on Dr. Hutchinson taking on the work of more than one physician.

115.    Dr. Hutchinson reiterated that he would need to adjust his workload and could not take on all the objectives that Mr. Silon deemed necessary for the project.

116.    Mr. Silon responded that Dr. Hutchinson was not to change his responsibilities, but assured Dr. Hutchinson that AstraZeneca would work with Dr. Hutchinson to find a mutually agreeable path forward.

117.    Dr. Hutchinson agreed not to speak to the team about changing his responsibilities so that Mr. Silon could speak to Mr. Dobber.

118.    Dr. Hutchinson summarized this conversation in an email to Mr. Silon later that day and stated that he looked forward to their scheduled meeting to discuss such issues further on May 9, 2024.

119.    On the morning of May 9, 2024, Dr. Hutchinson met with Mr. Silon to discuss the outcome of Mr. Silon's meeting with Mr. Dobber.

120.    During the meeting Mr. Silon offered Dr. Hutchinson a $100,000 retention bonus, but was not willing to address a merit increase without Dr. Hutchinson agreeing to accepting a lower overall compensation level in the Company, and he was not willing to further discuss how he would assess performance on Dr. Hutchinson's status at the completion of the program.

121.    Dr. Hutchinson responded that given the enormity of the workload, the offer presented by Mr. Silon was not appropriate.

122.    Dr. Hutchinson stated that he would continue to work to support the program but could not continue to do the work of multiple physicians and that his objectives would need to be adjusted accordingly.

123.    Mr. Silon stated that Dr. Hutchinson would need to perform all the objectives as outlined by Mr. Silon or be "fired for cause."

124.    At this time, Dr. Hutchinson asked that the discussion with Mr. Silon be continued later that day when Human Resources could be present to help moderate the discussion.

125.    Dr. Hutchinson also reached out to AstraZeneca CEO Pascal Soriot to discuss some of these issues, which he believed may help alleviate a difficult situation.

126.    Despite his nearly three decades of service and significant contributions to AstraZeneca, Mr. Soriot did not respond to Dr. Hutchinson's request for a brief discussion.

127.    Later, on May 9, 2024, Dr. Hutchinson again met with Mr. Silon and with Monica Marsh, Vice President of Human Resources.

128.    Mr. Silon remained unwilling to appropriately address any of Dr. Hutchinson's stated concerns.

129.    Dr. Hutchinson again noted that, with the objectives given to him, he would have to perform a role typically performed by multiple physicians on similar programs, and the team required additional knowledgeable clinician support given AstraZeneca's position.

130.    When Ms. Marsh questioned why he was only raising the issue at that time, Dr. Hutchinson explained that he had previously and recently raised the issue of having additional clinical support to no avail and thus his raising his concerns was not "sudden."

131.    Mr. Silon indicated that he had reviewed Dr. Hutchinson's draft job description and objectives, and provided comments.

132.    However, he insisted, disingenuously, that a single physician would be able to perform the objectives.

133.    Dr. Hutchinson responded that he had put time requirements next to each of the objectives to highlight the amount of time required for each objective, which were realistic estimates of time and clearly required more time than could be expected from one physician.

134.    Nevertheless, both Mr. Silon and Ms. Marsh disagreed.

135.    Dr. Hutchinson reminded them that, of the three people on the call, he was the only individual who had actually led FDA Advisory Committee meeting preparations for AstraZeneca and his estimates were realistic based on his experience.

136.    Mr. Silon then informed Dr. Hutchinson that he needed to perform all the objectives listed on the draft objectives or Dr. Hutchinson would be fired for cause and would need to leave AstraZeneca effective immediately following the meeting.

137.    Dr. Hutchinson was extremely shaken by this statement, as it was completely unexpected, and he had been hopeful to find a reasonable path forward at AstraZeneca.

138.    Dr. Hutchinson specifically asked Ms. Marsh if the current situation justified his termination for cause, and, in blind deference to the company, she stated that it did.

139.    Dr. Hutchinson specifically told Mr. Silon and Ms. Marsh that he had no intention of leaving AstraZeneca and wanted to work out a reasonable solution because the job required more than a single person.

140.    They both disagreed and informed Dr. Hutchinson that the job could be done by one individual.

141.    Dr. Hutchinson was then presented with an ultimatum to either be immediately terminated for cause or resign immediately – no other option was given.

142.     As he was not given any more time to decide the next step, and he did not want to lose retirement benefits, Dr. Hutchinson was forced to agree to retire when faced with the threat of an unjustified termination for cause.

143.     Dr. Hutchinson's forced resignation equates to a termination by AstraZeneca.

144.     It has become increasingly apparent to Dr. Hutchinson that AstraZeneca had a premeditated plan to use him for his undisputed skill, knowledge and experience on the project but then oust him immediately thereafter due to his age and his repeatedly raising significant safety issues.

145.     Notably, the comments and revisions to the objectives provided to Dr. Hutchinson were written in a manner to make it impossible for Dr. Hutchinson to achieve them, especially with the insufficient resources AstraZeneca was willing to provide.

146.     A closer scrutiny of Mr. Silon's "objectives" underscores the impossibility of certain goals.

147.     For example, Mr. Silon's objective stated to: "Ensure NDA approval is in line with FRC/LSPC HLR approved label assumptions."

148.     Dr. Hutchinson would not be able to guarantee this, as the FDA would almost certainly require changes to the label, as it was already known that they sought some changes, and the FDA Advisory Committee was also likely to ask for changes to the label.

149.     However, Mr. Silon's proposed objective meant that the FDA must accept what AstraZeneca provides or else Dr. Hutchinson would be deemed to have failed the objective – and there was no room for any label changes imposed by the FDA.

21

150.    In another example, Mr. Silon imposed an objective to: "deliver NDA approval in line with PDUFA date and budget assigned to project cutter and through implementation of the agreed project plan ($16m; 27th of March overview of financial projections)."

151.    Initially, this is not a "minimum requirement" for an objective – this is an ultimate measure of success.

152.    And, again, Dr. Hutchinson could not guarantee approval– - he would only be able to ensure that he and his team performed well at the Advisory Committee and worked to address the FDA's questions.

153.    With this objective, Dr. Hutchinson would be deemed to have "met expectations" only if he obtained FDA approval.

154.    Notably, however, the budget requirement could also present an issue if Mr. Silon determined to reallocate money, as he did in the prior years, allowing him to blame Dr. Hutchinson for missing the budget.

155.    It would be entirely unfair to place responsibility on Dr. Hutchinson for budget issues when Mr. Silon had the ability to reallocate money at any time.

156.    Two other objectives highlight how Mr. Silon was deliberating adding to Dr. Hutchinson's workload by giving him objectives that would have been the responsibility of William Mongan.

157.    In the first instance, Mr. Silon required Dr. Hutchinson to "Ensure web app application is ready for commercialization and reflective of FDA demands at PDUFA data of Dec 22nd".

158.    While Dr. Hutchinson was responsible for the medical contributions to the web application, the primary responsibility for delivering the application resided with William Mongan and Jerry Valentine.

159.    Not only was this an objective of someone Mr. Silon retired from AstraZeneca, but this is also an objective that is designed for failure since the FDA will almost certainly require changes to the web application, and completing these changes would likely occur after the PDUFA date.

160.    In the second instance, a proposed objective was to: "demonstrate close collaboration with cross-functional Cutter team including medical, IBEX and global R&D resources identified in the project plan."

161.    This vague and ambiguous objective appeared to require Dr. Hutchinson to perform Will Mongan's job in addition to his other significant responsibilities.

162.    The objectives given to Dr. Hutchinson were further concerning in light of Dr. Hutchinson's voiced concerns on numerous occasions regarding his excessive workload, particularly when AstraZeneca had let several commercial colleagues go, resulting in the expectation that Dr. Hutchinson would perform the work of those individuals as well.

163.    Prior to leading this project, Dr. Hutchinson was the Head of U.S. Regulatory.

164.    However, AstraZeneca reorganized its regulatory group and Dr. Hutchinson was made redundant.

165.    Because he was also acting as the Development Lead for Project Fleet (which included Project Cutter), AstraZeneca specifically requested that Dr. Hutchinson not leave the company and offered Dr. Hutchinson a retention bonus of approximately $105,000 to remain.

166.    Instead of working with Dr. Hutchinson to create a new job description, however, AstraZeneca merely grandfathered his current band I salary and used the U.S. Regulatory job description as the description for his new role.

167.    Thus, Dr. Hutchinson's performance review was assessed using an incorrect job description, which he discovered when he received his rating for his 2023 performance.

168.    Notably, Dr. Hutchinson's manager at the time, Will Mongan, informed Dr. Hutchinson that he believed Dr. Hutchinson's performance was "outstanding".

169.    Mr. Mongan stated that this rating was supported by Mr. Silon, however, following Mr. Silon's discussion on individual ratings with Mr. Silon's manager, Ruud Dobber, it was decided that Dr. Hutchinson should nonetheless be rated "met expectations."

170.    Dr. Hutchinson's repeated requests for clarity were not unreasonable under the circumstances.

171.    After his manager, Mr. Mongan, was separated from his employment, Dr. Hutchinson's core team had only four people left.

172.    One of those individuals, Operations Lead Melanie Morris, who was also critical to the project, was directly informed that she would be severed from the company after completion of the project unless she found another role.

173.    Similarly, there was no clear role for Dr. Hutchinson following the project.

174.    However, despite Mr. Silon's expressed intent to "treat all employees equally," Ms. Morris was in the same group as Dr. Hutchinson, but was directly informed that she would be severed following the project, with a discussion regarding severance to follow – and yet Dr. Hutchinson was not given the same consideration.

24

175.    Dr. Hutchinson was abruptly presented the choice of either being terminated from the company against his will for cause or resigning, and his final attempt to resolve his concerns with a brief discussion with Mr. Soriot was ignored.

176.    AstraZeneca also appears to have a pattern and practice of removing its older, senior commercial individuals.

177.    For example, Will Mongan (who was also forced to retire), Rick Skelly (who was forced to retire), and Dr. Hutchinson were all older employees who had been with the Company for over twenty-five (25) years at the time of their separations.

178.    Dr. Hutchinson did not want to retire or leave the company, but was forced to retire with immediate effect or be subject to immediate termination for cause.

179.    Dr. Hutchinson's separation was not voluntary.

180.    While Dr. Hutchinson was told by Joris Silon and Monica Marsh that the objectives provided by Mr. Silon were reasonable and obtainable by Dr. Hutchinson alone, they were not.

181.    Dr. Hutchinson explained that he wanted to stay with the company and deliver the program, but needed objectives that were reasonable for one individual.

182.    Dr. Hutchinson was dedicated to the project and was looking forward to the opportunity to deliver something very important to consumers.  He was willing to work toward a mutually acceptable solution, but AstraZeneca refused to do so.

183.    At the time of his termination, Dr. Hutchinson informed the company that he was to chair a Mock Advisory Board the following week and needed to help the team to perform this successfully.

184.    Dr. Hutchinson was informed, however, that his retirement was effective immediately, and that they would find someone else to do the work.

185.    The actions of AstraZeneca were not the actions of a company trying to work with its highly accomplished, well-respected, valued employee to find workable solutions.

186.    Nor did the company make any significant effort to provide any additional support to Dr. Hutchinson's project.

187.    Indeed, AstraZeneca has now added additional personnel to the project after releasing Dr. Hutchinson.

188.    This overtly demonstrates that Dr. Hutchinson's concerns and requests were valid.

189.    Since his termination, Dr. Hutchinson has been made aware that AstraZeneca approached other individuals to take over his role and/or certain responsibilities of his role, but they declined for lack of comfort or understanding of the program involved – demonstrating even further that there was no legitimate basis to terminate Dr. Hutchinson or force him to retire.

190.    Indeed, the day after Dr. Hutchinson's separation, Julie Aker, President and CEO of Concentrics Research, expressed extreme dismay at his separation, noting that Dr. Hutchinson was the face of the program and that no one knew as much as he did on the subject.

191.    Dr. Hutchinson also learned that his role had to be backfilled with no less than three additional physicians, in line with Dr. Hutchinson's previous concern that the role he was asked to perform would require more than one physician.

192.    In addition, a Medical Information Scientist was added to the project to assist with literature searches.

193.    This resource was denied to Dr. Hutchinson when he requested it months earlier.

194.    At the time, Dr. Hutchinson was told that he could do it.

195.    Further demonstrating the age bias against Dr. Hutchinson, the physicians selected to replace Dr. Hutchinson are significantly younger and much less experienced in developing nonprescription medications than Dr. Hutchinson.

196.    Indeed, two of the physicians selected to backfill Dr. Hutchinson's role are each at least fifteen to twenty years younger than Dr. Hutchinson.

197.    In addition to the above-noted wrongdoings against Dr. Hutchinson, Dr. Hutchinson has also learned that AstraZeneca has been falsely informing others that Dr. Hutchinson retired, effectively immediately, suggesting that Dr. Hutchinson had suddenly and abruptly retired without notice.

198.    This defamatory statement – which was made to several third parties - is not only untrue but also is devastating to Dr. Hutchinson's career, career prospects and professional reputation, as it creates a false impression that, among other things, because Dr. Hutchinson had abruptly resigned from his position without warning that would be expected of a professional in his position, he thus has low moral character, is unethical, and/or is unfit to conduct his business, trade or profession.

199.    In fact, Dr. Hutchinson has learned that at least two subsequent job opportunities have declined to work with and/or consider Dr. Hutchinson for employment based on the defamatory communications regarding the nature of Dr. Hutchinson's departure from AstraZeneca.

200.    Moreover, AstraZeneca's false claim that Dr. Hutchinson retired is further evidence of AstraZeneca's discriminatory animus against Dr. Hutchinson on the basis of his age, as it indicates that AstraZeneca considered Dr. Hutchinson to be of retirement age.

201.    Dr. Hutchinson further notes that, given the circumstances surrounding his termination and the contractual commitments made to him by AstraZeneca, he is due significant earned wages in the form of severance benefits.

202.    More specifically, because Dr. Hutchinson's forced retirement was obtained by putting him under the duress of either being terminated for cause or resigning, it should be treated as a termination without cause, entitling him to significant severance.

203.    In light of the circumstances outlined above, and given his treatment during his employment with AstraZeneca and the circumstances surrounding his termination, Dr. Hutchinson maintains that he was discriminated against and harassed on the basis of his age, retaliated against for complaining about discrimination and harassment, retaliated against for raising safety concerns, and that Dr. Hutchinson's raising of important issues that challenged how AstraZeneca was managing certain safety issues motivated AstraZeneca's decision to remove Dr. Hutchinson from his employment.

204.    Moreover, because Dr. Hutchinson was terminated, he is contractually owed additional pay and severance.

205.    Dr. Hutchinson has suffered mental anguish and severe emotional distress as a direct and proximate result of the actions and inactions of AstraZeneca.

206.    AstraZeneca and its agents acted with the intent of causing or with reckless disregard for the probability that their actions would cause Dr. Hutchinson severe emotional distress.

207.    Dr. Hutchinson has suffered financial losses, which include, among other things, lost wages, medical expenses, and an obligation for attorneys' fees and costs of bringing suit, as a direct and proximate result of the actions and inactions of AstraZeneca.

## COUNT I
### Age Discrimination in Employment Act, 29 U.S.C. § 621, et seq.
### (Plaintiff v. AstraZeneca)

208.    Plaintiff Howard Hutchinson repeats and incorporates by reference the allegations of all preceding paragraphs as if fully set forth at length herein.

209.    Based on the foregoing, AstraZeneca has engaged in unlawful employment practices in violation of the ADEA.

210.    Plaintiff is, and was at the time of his termination, over forty years of age, and an individual within the class protected by the Age Discrimination in Employment Act.

211.    In discriminating against and harassing Dr. Hutchinson because of his age, and in retaliating against Dr. Hutchinson because of his complaints about discrimination and harassment, AstraZeneca violated the Age Discrimination in Employment Act.

212.    AstraZeneca's violations were intentional and willful.

213.    AstraZeneca's willful violations of the ADEA warrant an award of liquidated damages.

214.    As the direct and proximate result of AstraZeneca's violation of the Age Discrimination in Employment Act, Plaintiff Howard Hutchinson has sustained loss of earnings, severe emotional and psychological distress, loss of self-esteem, loss of future earning power, as well as back pay, front pay, and interest due thereon, and has incurred attorneys' fees and costs.

## COUNT II
### Delaware Discrimination in Employment Act, 19 Del. C. § 711, et seq.
### (Plaintiff v. All Defendants)

215.    Plaintiff Howard Hutchinson repeats and incorporates by reference the allegations of all preceding paragraphs as if fully set forth at length herein.

216.     Based on the foregoing, AstraZeneca engaged in unlawful employment practices in violation of the Delaware Discrimination in Employment Act.

217.     In discriminating against and harassing Dr. Hutchinson on the basis of his age, and in retaliating against Dr. Hutchinson because of his complaints about discrimination and harassment, AstraZeneca violated the DDEA.

218.     In aiding and abetting AstraZeneca's discrimination, harassment and retaliation, Joris Silon violated the DDEA.

219.     Defendants' violations were intentional and willful.

220.     Defendants' intentional and willful violations warrant an award of punitive damages.

221.     As the direct and proximate result of AstraZeneca's violations of the Delaware Discrimination in Employment Act, Plaintiff Howard Hutchinson has sustained a loss of earnings, severe emotional and psychological distress, loss of self-esteem, loss of future earning power, as well as back pay, front pay, and interest due thereon, and has incurred an obligation for attorneys' fees and costs.

## COUNT III
### Wrongful Termination
### (Plaintiff v. AstraZeneca)

222.     Plaintiff Howard Hutchinson repeats and incorporates by reference the allegations of all previous paragraphs as if fully set forth at length herein.

223.     A covenant of good faith and fair dealing was implied in Dr. Hutchinson's employment agreement with AstraZeneca.

224.     On several occasions, Dr. Hutchinson raised safety concerns including issues regarding the labeling of AstraZeneca products and openly disagreed with the decisions made by

AstraZeneca, including with respect to a potentially problematic drug-drug interaction between two AstraZeneca products, rosuvastatin and ticagrelor.

225.    After review of the information, Dr. Hutchinson stated that the dose must be capped at 20mg, with appropriate safety and dosing instructions given.

226.    Dr. Hutchinson stated that AstraZeneca must tell health care providers how to manage it – but AstraZeneca declined to do so.

227.    Dr. Hutchinson thus asserted a public interest in the health and safety of the general public with respect to drug safety.

228.    In his role as Chief Medical Officer at AstraZeneca, Dr. Hutchinson was required to assess all new information that would have a significant impact on the safety or efficacy of an AstraZeneca product.

229.    Thus, Dr. Hutchinson occupied a position with responsibility for advancing or sustaining drug safety, drug side effects and potential drug-drug interactions.

230.    AstraZeneca wrongfully terminated Dr. Hutchinson in violation of public policy and in violation of the duty of good faith and fair dealing implied in Dr. Hutchinson's employment contract.

231.    The above-described conduct of AstraZeneca, in terminating Dr. Hutchinson, represents wrongful termination pursuant to the common law of the State of Delaware.

232.    As the direct and proximate result of AstraZeneca's wrongful termination of Dr. Hutchinson, Plaintiff has sustained a loss of earnings, severe emotional and psychological distress, loss of self-esteem, damage to his professional reputation and career, loss of future earning power, as well as back pay, front pay, and interest due thereon, and has incurred attorneys' fees and costs.

31

## COUNT IV
**Delaware Whistleblowers' Protection Act, 19 Del. C. §§ 1701, <u>et seq</u>.**
**(Plaintiff v. AstraZeneca)**

233.    Plaintiff Howard Hutchinson repeats and incorporates by reference the allegations of all previous paragraphs as if fully set forth at length herein.

234.    On several occasions, Dr. Hutchinson raised safety concerns including issues regarding the labeling of AstraZeneca products and openly disagreed with the decisions made by AstraZeneca, including with respect to a potentially problematic drug-drug interaction between two AstraZeneca products, rosuvastatin and ticagrelor.

235.    Dr. Hutchinson reported his legitimate safety concerns to his superiors and openly disagreed with the decisions made by his superiors dismissing his safety concerns.

236.    In retaliation for his reports, AstraZeneca terminated Dr. Hutchinson, in violation of the Delaware Whistleblowers' Protection Act.

237.    As the direct and proximate result of AstraZeneca's wrongful termination of Dr. Hutchinson in violation of the Delaware Whistleblowers' Protection Act, Plaintiff has sustained a loss of earnings, severe emotional and psychological distress, loss of self-esteem, damage to his professional reputation and career, loss of future earning power, as well as back pay, front pay, and interest due thereon, and has incurred attorneys' fees and costs.

## COUNT V
<u>**Defamation**</u>
**(Plaintiff v. AstraZeneca)**

238.    Plaintiff Howard Hutchinson repeats and incorporates by reference the allegations of all previous paragraphs as if fully set forth at length herein.

239.    Dr. Hutchinson has learned that AstraZeneca has been falsely informing others that Dr. Hutchinson retired, effectively immediately, suggesting that Dr. Hutchinson had suddenly and abruptly retired without notice.

240.    The above-described conduct of AstraZeneca constituted actionable defamation.

241.    This defamatory statement – which was made to several third parties - is not only untrue but also is devastating to Dr. Hutchinson's career, career prospects and professional reputation, as it creates a false impression that, among other things, because Dr. Hutchinson had abruptly resigned from his position without warning that would be expected of a professional in his position, he thus has low moral character, is unethical, and/or is unfit to conduct his business, trade or profession.

242.    Third parties to whom the false, negative statements were published understood that the statements were about Dr. Hutchinson.

243.    AstraZeneca promulgated the untrue statements with knowledge, among other things, that the statements were inaccurate, that Dr. Hutchinson had not suddenly and abruptly retired without notice, and that Dr. Hutchinson was not of low moral character, unethical, or unfit to conduct his business, trade or profession.

244.    In communicating false, negative information to third parties about Dr. Hutchinson, AstraZeneca defamed Dr. Hutchinson.

245.    AstraZeneca's promulgation of the untrue statements exposed Dr. Hutchinson to contempt, ridicule, hatred, and degradation of character, and resulted in loss of earnings, severe emotional and psychological distress, loss of self-esteem, loss of future earning power, and damage to his reputation, career and future career prospects.

### COUNT VI
### Breach of Contract
### (Plaintiff v. AstraZeneca)

246.    Plaintiff Howard Hutchinson repeats and incorporates by reference the allegations of all previous paragraphs as if fully set forth at length herein.

247.    Given the circumstances surrounding his termination and the contractual commitments made to him by AstraZeneca, Dr. Hutchinson is due significant earned wages in the form of severance benefits.

248.    Per the terms of the company severance plan, in the event of termination of employment without cause, an AstraZeneca employee is to be paid severance.

249.    Dr. Hutchinson was terminated without cause.

250.    More specifically, because Dr. Hutchinson's forced retirement was obtained by putting him under the duress of either being terminated for cause or resigning, it should be treated as a termination without cause, entitling him to significant severance.

251.    AstraZeneca has not paid Dr. Hutchinson his severance.

252.    AstraZeneca breached its contract with Dr. Hutchinson as alleged herein.

253.    Dr. Hutchinson suffered and seeks damages for AstraZeneca's breaches of the aforementioned agreement.

254.    AstraZeneca's conduct is without excuse or justification.

### COUNT VII
### Delaware Wage Payment and Collection Act,
### 19  el. C.§§ 1101 et seq. ("DWPCA")
### (Plaintiff v. AstraZeneca)

255.    Plaintiff Howard Hutchinson repeats and incorporates by reference the allegations of all previous paragraphs as fully as though the same were set forth at length herein.

256.   At all relevant times, AstraZeneca was an employer as defined by the DWPCA.

257.   At all relevant times, Plaintiff was an employee of AstraZeneca as defined by the DWPCA.

258.   Plaintiff was an employee who was entitled to significant severance upon his termination without cause.

259.   AstraZeneca agreed to compensate Plaintiff with significant severance compensation in the event of his termination without cause as alleged herein.

260.   Despite this, AstraZeneca has failed and refused to pay Plaintiff the unpaid severance due to him.

261.   Plaintiff's earned but unpaid severance pay is wages within the definition of the DWPCA.

262.   As a result of AstraZeneca's failure to pay Plaintiff's earned wages due to him, AstraZeneca violated the DWPCA and the regulations promulgated thereunder.

263.   By virtue of AstraZeneca's violation of the DWPCA, Plaintiff is entitled to recover from AstraZeneca his unpaid wages, plus liquidated damages, interest, costs of suit and attorneys' fees and other such legal and equitable relief as the Court deems just and proper.

### COUNT VIII
**Promissory Estoppel**
**(Plaintiff v. AstraZeneca)**

264.   Plaintiff Howard Hutchinson repeats and incorporates by reference the allegations of all previous paragraphs as fully as though the same were set forth at length herein.

265.   For the reasons set forth above, AstraZeneca is liable to Plaintiff under a theory of Promissory Estoppel.

35

266.     Count VIII is brought in the alternative to Count VI, above, to the extent that no valid contract is found to exist.

267.     In the alternative, AstraZeneca made the promises described herein to Dr. Hutchinson with respect to his severance pay.

268.     In making these promises to Dr. Hutchinson, AstraZeneca knew and reasonably expected to induce action or forbearance by Dr. Hutchinson, specifically, to continue employment with AstraZeneca and forego other lucrative opportunities in the industry.

269.     Based on the promises and representations made by AstraZeneca, Dr. Hutchinson continued working for AstraZeneca and forewent other lucrative opportunities that he could have explored throughout his employment with AstraZeneca.

270.     Because AstraZeneca broke its promises to Dr. Hutchinson, Dr. Hutchinson has sustained financial and other damages, including, but not limited to, loss of earnings, severe emotional and psychological distress, loss of self-esteem, loss of future earning power, as well as back pay, front pay, and interest due thereon.

271.     Plaintiff is now suffering and will continue to suffer irreparable harm and monetary damages as a result of AstraZeneca's actions unless and until this Court grants the relief requested herein.

**COUNT IX**
**Unjust Enrichment**
**(Plaintiff v. AstraZeneca)**

272.     Plaintiff repeats and incorporates by reference the allegations of all previous paragraphs as fully as though the same were set forth at length herein.

273.     For the reasons set forth above, AstraZeneca is liable to Plaintiff under a theory of Unjust Enrichment.

274.    Count IX is brought in the alternative to Count VI, above, to the extent that no valid contract is found to exist.

275.    Dr. Hutchinson provided to AstraZeneca his expert services, reputation, industry contacts and performance with the expectation of reaping the benefits of the promises made to him by AstraZeneca.

276.    Dr. Hutchinson provided these services to AstraZeneca through his hard work and arduous efforts.

277.    AstraZeneca used the services provided by Dr. Hutchinson to further their business activities and earn profits.

278.    After inducing Dr. Hutchinson to provide his expert and valuable services, industry contacts, and reputation in the industry, AstraZeneca failed and/or refused to honor their commitments to Dr. Hutchinson with respect to the promises made to him regarding severance.

279.    Allowing AstraZeneca to retain the benefits provided by Dr. Hutchinson is inequitable.

280.    AstraZeneca has been unjustly enriched at the expense of Dr. Hutchinson.

281.    It is unconscionable for AstraZeneca to so profit from their own unjust and inequitable conduct.

## **PRAYER FOR RELIEF**

282.    Plaintiff Howard Hutchinson repeats and incorporates by reference the allegations of all preceding paragraphs as if fully set forth at length herein.

**WHEREFORE**, Plaintiff Howard Hutchinson respectfully requests that this Court enter judgment in his favor and against Defendants and Order:

    a.    Appropriate equitable relief, including reinstatement or front pay;

b.  Defendants to compensate Plaintiff with a rate of pay and other benefits and emoluments of employment to which he would have been entitled had he not been subjected to discrimination, retaliation and wrongful termination;

c.  Defendants to compensate Plaintiff with the wages and other benefits and emoluments of employment lost because of Defendants' unlawful conduct;

d.  Defendants to pay Plaintiff punitive damages;

e.  Defendant AstraZeneca to pay Plaintiff his earned but unpaid wages;

f.  Defendant AstraZeneca to pay Plaintiff liquidated damages;

g.  Defendants to pay Plaintiff compensatory damages for future pecuniary losses, pain and suffering, inconvenience, mental anguish, loss of employment and other nonpecuniary losses as allowable;

h.  Defendants to pay Plaintiff's costs of bringing this action, including, but not limited to, Plaintiff's attorneys' fees;

i.  Plaintiff be granted any and all other remedies available under the ADEA, the DDEA, the Delaware Whistleblowers' Protection Act, the DWPCA, and the common law of the State of Delaware; and

j.  Such other and further relief as this Court deems just and proper.

## JURY DEMAND

Plaintiff Howard Hutchinson hereby demands trial by jury as to all issues so triable.

Respectfully submitted,

SALMON, RICCHEZZA, SINGER & TURCHI, LLP

*/s/ Ronald L. Daugherty*
Ronald L. Daugherty (#5146)
222 Delaware Avenue 11th Floor
Wilmington, DE 19801
Tel: (302) 655-4290
rdaugherty@srstlaw.com

*Attorney for Plaintiff*

DATED: July 25, 2025